Plaintiff, widow of Philip Graham Ingram, seeks in this suit to recover damages arising from the death of her said husband alleged to have resulted from injuries received by being struck by an automobile owned by the Woodley Petroleum Company and driven by its President, John Woodley, who, together with the liability insurer, are made defendants herein.
This is the second time that this case has been before this Court on appeal. On the first occasion the judgment of the First Judicial District Court of Caddo Parish in favor of plaintiff was ordered reversed, annulled and set aside, and judgment was rendered in favor of defendants rejecting plaintiff's demands. The basis upon which our judgment was predicated was the failure of plaintiffs to establish the fact that the injuries sustained by reason of the alleged negligence of the defendant, Woodley, resulted in death. Ingram v. State Farm Mutual Automobile Insurance Co. et al., La. App.,31 So.2d 423. *Page 782 
On application for rehearing and after reconsideration of the matter, we set aside our original judgment and remanded the case to the District Court for the admission of evidence bearing upon the cause of death and for judgment thereon by said Court, subject to the right of appeal.
In accordance with our decree the case was taken up for trial by the District Court for the restricted purpose of receiving evidence with regard to the establishment of the cause of death. After trial the District Court again rendered judgment in favor of plaintiff and against the defendants, in solido, in the full sum of $8,348.00, together with interest and costs. From this judgment defendants have appealed.
[1] Before proceeding to a discussion of the merits of this case, it is noted that at the opening of the trial before the District Court, after this cause was remanded by our judgment on rehearing, counsel objected to the admission of any evidence on the ground that our judgment was contrary to law in that it remanded the case without the granting of a rehearing and without giving an opportunity to the defendant to be heard thereon.
This objection has not been urged before this Court by counsel for defendants either in oral argument or brief, and, therefore, must be conclusively presumed to have been abandoned. We mention the point thus briefly only in order to preclude the possibility of complications which might arise in the future by the attempt to re-urge this objection.
As a matter of convenience, and further for the purpose of clarifying some ambiguities and misunderstandings which appear to have arisen from the statement of facts which were set forth in the opinion of this Court on the occasion of the first appeal, we feel it is desirable to restate the pertinent facts.
About noon on May 1, 1946, plaintiff's deceased husband, a pedestrian, was engaged in negotiating the crossing of Fairfield Avenue, one of the principal residential thoroughfares of the City of Shreveport. The crossing was being made from east to west along the extended south sidewalk line of Wilkinson Street, the intersection of the two streets being a recognized, established and authorized pedestrian crossing. The defendant, Woodley, was driving his Buick sedan south on Fairfield Avenue, at a speed of about or slightly less than thirty miles per hour, on his right-hand side of said street, the left side of his car being slightly west of the center line thereof. After the front portion of the Woodley car had passed the south line of Wilkinson Street the decedent was struck by the car in such manner that his head came into violent contact with the left portion of the windshield, which was shattered by the impact. The body of the decedent appeared to momentarily hang upon the cowl of the car before slipping to the pavement. When the car was brought to a stop with the rear end some ten or twelve feet beyond the south line of the Wilkinson Street sidewalk extension at the intersection, the body of the decedent, extending diagonally in a southeasterly direction, was lying some few feet behind the left rear wheel. Woodley stepped out of his car and turned Ingram's unconscious body from a position on the left side until it was resting on its back. He then called to a negro yard man, who was standing on the sidewalk at the northwest corner of the intersection, to watch the body while he ran across the street to telephone for an ambulance.
In our first opinion in this case we erroneously stated that the attention of the negro yard man, to whom reference is above made, was attracted by the sound of the impact of the body against the car. As a matter of fact, his attention was drawn, so he testified, by the sound of the application of brakes, and as he turned he observed Ingram's body sliding off of the car in such fashion that the negro testified he thought the man had fallen out of the car.
While Woodley was crossing the street, intent upon reaching a phone for the purpose of calling an ambulance, a Ford automobile, driven by one H.B. Aycock, proceeding east on Wilkinson Street, came to the legally required stop at the intersection of said street with Fairfield Avenue. The driver inquired of the negro as to what had happened and was informed that there had been an accident, after which he turned to the right, that is, south into Fairfield Avenue, *Page 783 
and inadvertently ran over the body of the unfortunate victim. Apprised of this fact by the shout of the negro, Aycock immediately parked his car in front of the Woodley car and near the right-hand curb of Fairfield Avenue, and returned to the scene of the accident.
In the meantime still another party had arrived on the scene, and, after determining that the ambulance had not been called, he proceeded to telephone for this aid. The ambulance arrived some fifteen minutes later and removed Ingram to the Schumpert Sanitarium, where he died about 5:00 o'clock the same afternoon without recovering consciousness.
Our first judgment reversing the judgment of the District Court in favor of plaintiff, which was predicated on failure to satisfactorily establish the cause of Ingram's death, was later reconsidered and set aside, and, as above stated, the cause was remanded to the District Court for the taking of evidence on this point on the basis of the authority set forth in the per curiam on rehearing.
The testimony taken on the second trial in the District Court bearing upon the cause of death definitely establishes the fact that Ingram suffered a fracture of the base of the skull, numerous abrasions and lacerations, and, probably, a puncture of the lung. Dr. Charles S. Boone, Deputy Coroner of Caddo Parish, testified that he assigned the cause of death as "traumatism by crushing." His further testimony was that the crushing was due to an automobile and that the injuries determined were "fracture of the skull and multiple contusions and abrasions," which injuries were the cause of death.
[2] Under the circumstances we feel that no useful purpose would be served by a detailed discussion attempting to distinguish and identify the injuries which resulted, first, from the violent blow received from the Woodley car, and, second, from the injuries inflicted by the Aycock car. Consideration of the testimony bearing on the cause of death convinces us that the fracture of the skull unquestionably resulted from the violent impact with the Woodley car. Since this in itself was sufficient to cause death, any injuries received from the Aycock car were superfluous.
Accordingly, we have encountered not the slightest difficulty in reaching the conclusion that the resolution of this case must rest upon a determination of the question of negligence on the part of Woodley.
[3] The only eye witness to the accident was Woodley himself, and, after close examination and thorough study of his testimony, we are definitely of the opinion that it is sufficient in itself to conclusively establish his negligence as being the sole and proximate cause of the accident which resulted in Ingram's death.
The sworn statement of Mr. Woodley at the coroner's hearing, which was held for the purpose of inquiring into the facts and circumstances of the accident, contains the following declarations:
"I was going south on Fairfield driving a 1938 Buick sedan, my own car, and there was a car looked like about four car lengths ahead of me. I was driving between 25 and 30, I was under 30 I know; I was keeping pace with the other car pretty well and I just happened to see a glimpse of the man standing
— after this car ahead of me passed by him — and it seems as though I saw the man take a step and then he turned his eyestoward me and stopped and sorter straightened up. I started to throw my brake on and just as soon as he straightened up I putmy foot back on the accelerator and went on and the next thingI knew I saw him coming to my windshield. I know I put my brake on before he ever hit my windshield. I just saw something there and I just threw my foot on my brake right quick and there he was right there on my hood."
(Emphasis by the Court.)
"Q. Which way was Mr. Ingram facing when you first saw him? A. West, he was on the East side of Fairfield and this car passed him. I did not see him until after the car passed him,
this was the car ahead of my car.
"I was pretty well back of that car. He was driving on the right hand side and I was too but probably closer to the middle and the street kinder makes a little turn there." *Page 784 
"* * * I glanced in my mirror to see if there was anybody back of me —"
It is to be observed by reason of the above quoted statements of Mr. Woodley that it was mere circumstance that he "happened" to see Ingram. It is also worthy of note that he testified that Ingram took a step and then "turned his eyes toward me."
It is obvious that Woodley did not continue to observe the pedestrian who, unquestionably, was in a place of danger within, or certainly very near, the path of the automobile.
By way of comparison we quote the following extracts from Woodley's testimony on the occasion of the trial of this case:
"Q. You did not slow down your car at all then? A. No, not when he looked at me and stopped.
"Q. What did you next see of him — he looked at you and stopped and then you went on? A. I went on looking right at him until I got near to him and threw my eyes over to one side anddown the street.
"Q. You got near him? A. Yes.
"Q. And then what? A. Going by him.
"Q. Got near him and you were going by him and what happened? A. The next thing he was looking right at me through my windshield.
"Q. You said you looked to one side for one purpose or another. A. I put my eyes on down. I was passing by him and he was right at me.
"Q. You were looking beyond him then? A. Yes, I was fixing to pass him.
"Q. You were fixing to pass him and took your eyes off of him. Is that right? A. Why, yes. When he turned around when I passed him — I was fixing to pass him —.
"Q. (interrupting) And he fell into your car when you were not looking. A. I guess he did because he was up on my hood."
"Q. You did not see him for some little time before you hit him? A. I saw him plain. If he had stopped he had plenty oftime to miss my car."
We do not think the inconsistencies of Mr. Woodley's testimony are of major importance, but we are firmly convinced by his own statements that he was not keeping a proper lookout and that he was depending upon Ingram, a pedestrian, taking care of himself and his safety, therein failing to assume the obligations which sound common sense, as well as well defined legal principles, require of the drivers of motor vehicles.
Industrious counsel for plaintiff has repeatedly emphasized in his briefs, as well as in oral argument, testimony which appears in the record with reference to tire marks for a distance of some seventy-five feet along Fairfield Avenue. Counsel contends that these marks were made by the Woodley car; that they began on the north side of the intersection of Fairfield and continued across the intersection and beyond the south line thereof. In our first study of this record we were not inclined to attach much significance to this fact, primarily because one of plaintiff's witnesses testified that the skidmarks in question did not lead to the Woodley car. However, repeated reviewing of the testimony has served to convince us that our first impression to the above effect was in error. Admittedly by Woodley's testimony he was driving his automobile, a 1938 Buick Sedan, at a speed of about thirty miles an hour. At this rate of speed it would have been utterly impossible for Mr. Woodley to have brought his car to a complete stop, as was done, within the extremely short distance beyond the intersection, which distance was a matter of only a few feet. In this connection it must be borne in mind that Woodley testified that he did not put on his brakes until Ingram's head had crashed into the windshield of the car. Inasmuch as Ingram was crossing at the south sidewalk line of Wilkinson Street, and since the front portion of Woodley's car had passed Ingram in safety, the acceptance of this version of facts would require a holding that Woodley's physical reaction of removing his foot from the accelerator to the brake, applying the brake, and the effectuation of a complete stop of the automobile traveling at thirty miles per hour, required the consumption of only a fraction of a second of time and a distance of not more than the length of the automobile itself. Such a conclusion would *Page 785 
be absurd and completely insupportable. It therefore becomes obvious that Woodley must have applied the brakes of his carbefore he struck Ingram.
Careful reviewing of the record brings to light the fact that there is testimony to the effect that at some time subsequent to the accident Woodley's car was removed from the position where it had been brought to a stop after the impact and was moved over nearer the west curb on Fairfield. This would account for the fact that the witness, who later came on the scene and who testified positively as to the presence of the skidmarks of the tires along Fairfield, was correct in attributing this evidence to the braking of the Woodley car. It would further reconcile this fact with the testimony to the effect that the skidmarks did not lead to the Woodley car.
There is an additional reason in this connection which adds certainty to the conclusion we have reached. In a most excellent article by Hollingsworth B. Barret, Esq., a member of the Shreveport Bar, entitled "Mechanics of Control and Lookout in Automobile Law," Tulane Law Review XIV, 492, there is set forth a data table bearing upon the factor of "stopping distance." The figures given in this table fix the "stopping distance" of a motor vehicle traveling at thirty miles per hour, forty-four feet per second, at 68.3 feet with a "stopping time" of 2.35 seconds. Both figures include an allowance for "reaction time."
Conceding that the above figures are only approximate, and making due allowance for a reasonable margin of error either way, they bear out the conclusion which we have reached as above stated. Using the same data table we observe that the net braking distance of a vehicle traveling at a speed of thirty miles per hour is given as 35.3 feet. This would be the distance in which the actual application of brakes would be reflected by skidmarks on the pavement. According to the testimony the skidmarks measured approximately seventy-five feet. While it is true that the witness who testified on this point could not recall the beginning point at which the skidmarks became apparent, he was certain that they passed the intersection south of Wilkinson Street.
Measurements taken at the street intersection determined the fact that Wilkinson Street from curb to curb is 27 feet 7 inches west of the intersection and 30 feet 1 inch east of the intersection. The sidewalks on the south side of Wilkinson Street, both east and west of the Fairfield intersection, are 3 feet 11 inches in width. Keeping these measurements in mind, and making the fullest possible allowance in defendant's favor with respect to the distances involved, the fact becomes strikingly clear that Woodley could not have begun making application of his brakes only at the moment of the impact and brought his car to a complete stop only a few feet beyond the south line of Wilkinson Street at the intersection. If his story is given full credence, his car would have been not less than sixty feet from this point when it came to a stop.
From these observations we feel certain that Woodley must have begun to make application of his brakes as soon as he noticed the presence of Ingram in the street. If he was some forty feet behind another car, the reaction distance referred to above gives almost the exact allowance which would have enabled him to set his brakes at or just before entering the intersection at the north line of Wilkinson Street. This view is further strengthened by the testimony of the negro yard man, who was on the northwest corner of the intersection, to the effect that his attention was drawn by the sound of brakes and that at the time the Woodley car was just north "of the corner of Wilkinson."
There is no intention on the part of this Court to impugn the good faith of Mr. Woodley or his effort to truthfully set forth the facts as he saw them. The difficulty of a determination of this case has necessitated a critical analysis of all the testimony, and we are satisfied that by reason of the excitement and shock attendant upon the unfortunate accident, Mr. Woodley, in retrospect, was unable to explain just how the accident occurred.
These facts we find to be indisputable:
(1) Woodley did not see Ingram when he was at a sufficient distance to have taken, necessary precautions in avoiding the accident, or, *Page 786 
(2) If he did see him, he allowed his attention to stray to such extent that he did not keep the pedestrian, who was in a place of danger, under close and continued observation, which would have permitted him to avoid the accident.
Under either of these theories Woodley must be held guilty of such negligence as renders him liable in damages.
We believe the true facts to be that Woodley, following some forty feet more or less behind a car, first looking in his rear view mirror, then observing the intersection, which he was approaching, for vehicular traffic, suddenly, to use his own words, "happened to see a glimpse" of Ingram when he was so close that the immediate application of his brakes did not serve to avert the accident.
We have carefully considered the cases cited in the briefs of counsel for defendants, particularly the two cases which were especially emphasized as being applicable to the instant case, Johnson v. Zeringue et al., La. App., 151 So. 105, and Faecher v. Claret, La. App., 162 So. 227. Our appreciation of the facts of the case before us serves to readily distinguish it from the cases upon which defendants rely, and therefore renders inapplicable the holdings made and the conclusions reached in the cited cases.
We are further confirmed in our conclusion by the fact that the distinguished Judge of the District Court considered this matter on two separate occasions and each time gave judgment in favor of plaintiff. By reason of the interpretation of the facts involved as above set forth, which facts we feel to be decisive, we find no error in the judgment from which the appeal has been taken.
As to the charge of contributory negligence which is urged by defendants, we feel that the clearly enunciated principles set forth in Rottman v. Beverly, 183 La. 947, 165 So. 153, conclusively dispose of this contention.
Counsel for defendants have made no issue as to the quantum of damages awarded in the judgment appealed from before this Court. Our consideration of the record convinces us that the award made is proper.
The judgment appealed from is affirmed at appellant's cost.